MANHATTAN TANKERS,
INC., Plaintiff,

v.

Elizabeth H. DOLE, Secretary of Transportation and Adm. James S. Gracey, Commandant, U.S. Coast Guard, Defendants,

and

Ogden Challenger Transport, Inc., Intervenor-Defendant.

Civ.A. No. 83–3628.

United States District Court,
District of Columbia.

Oct. 31, 1984.

---

William E. McDaniels, Williams & Connolly, Washington, D.C., for plaintiffs; Kevin T. Baine, F. Lane Heard, and Steven R. Kuney, Williams & Connolly, Washington, D.C., on brief.

Scott T. Kragie, Asst. U.S. Atty., Washington, D.C., for defendants; Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., on brief.

Hugh N. Fryer, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., for intervenor-defendant; Philip W. Buchen, and Craig S. King, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., Dierdre A. Burgman, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, on brief.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

This matter comes before the Court on cross motions for summary judgment. The plaintiff owns an oil tanker, the MANHATTAN, built in the United States for use in the U.S. coastwise shipping trade. It brought this action challenging the decision of the Coast Guard permitting the entry of a vessel, owned by the intervenor-defendant, into the coastwise trade under the Wrecked Vessel Statute, 46 U.S.C. § 14. In an earlier Opinion, this Court determined that the plaintiff, Manhattan Tankers, a competitor of the intervenor-defendant, has standing to bring this suit. *Manhattan Tankers, Inc. v. Dole,* 587 F.Supp. 473 (D.D.C.1984).

After considering the cross motions for summary judgment, supporting and supplemental memoranda, and oral argument, the Court has decided, for the reasons set forth in this Opinion, to deny the plaintiff's motion, and to grant the joint motion of the defendants and intervenor-defendant for summary judgment. The Court has today issued an Order consistent with this Opinion.

## BACKGROUND

### A. *The Statute and the Legislative History.*

The plaintiff challenges the Coast Guard's documentation of a vessel now owned by the intervenor-defendant, Ogden Challenger Transport ("Ogden"). The Coast Guard registered the ship pursuant to the Wrecked Vessel Act, 46 U.S.C. § 14. That statute was enacted in 1915, and it was similar to a predecessor statute in effect from 1852 to 1906. In essence, the statute provides for registration of foreign-built vessels which have wrecked in U.S. waters, and have been substantially rebuilt by U.S. repairmen. In complete text, the statute reads:

> The Commissioner of Customs may issue a register or enrollment for any vessel wrecked on the coasts of the United States or her possessions or adjacent waters, when purchased by a citizen or citizens of the United States and thereupon repaired in a shipyard in the United States or her possessions, if it shall be proved to the satisfaction of the Commissioner, if he deems it necessary, through a board of three appraisers appointed by him, that the said repairs put upon such vessels are equal to three times the appraised salved value of the vessel: *Provided,* That the expense of the appraisal provided for shall be borne by the owner of the vessel: *Provided further,* That if any of the material matters of fact sworn to or represented by the owner, or at his instance, to obtain the register of any vessel are not true, there shall be a forfeiture to the United States of the vessel in respect to which the oath shall have been made, together with tackle, apparel, and furniture thereof.

46 U.S.C. § 14.

Although this statute was originally enacted in 1915, a very similar statute was in effect between 1852 and 1906. Congress

repealed the act in 1906 because the Commerce Department, in a rare desire to relieve itself of authority, had complained that it lacked the expertise and manpower necessary to make the statutory determinations. As the 1914 Senate Report stated, in reference to the earlier repeal:

> The burden of the objections to Section 4136 made by the Commissioner of Navigation ... was that his bureau had a limited clerical force, incapable of giving the proper investigation to the important subject involved, and that the committees of Congress could examine more thoroughly into each case as it presented itself.

S.Rep. No. 816, 63d Cong., 2d Sess. 2 (1914).

After the 1906 repeal, Congress itself took over the registration of eligible wrecked vessels through special legislation on a case-by-case basis. But after a few years, the Senate Commerce Committee concluded that the repeal had adversely affected American shipyards, and in 1915 the statute was enacted as it appears today. *See* 46 U.S.C. § 14. This new statute, however, contained some changes from the earlier one. Congress was still aware of the burdens involved in administering the statute, so the new act provided for an independent board of appraisers to relieve the administering agency from becoming entangled in complex registration proceedings. To reduce the costs to the government, the act required the applicant to cover the expenses of the appraisal. Congress also provided a new safeguard on the face of the statute—a penalty of forfeiture if the applicant makes any false representations to the board.

In 1979, the House of Representatives undertook consideration of a bill which would have eliminated the registry provisions permitting certain foreign-built vessels to enroll for, *inter alia,* the U.S. coastwise trade. *See* 125 *Cong.Rec.* H7972 (1979) (House consideration of H.R. 1196). The Senate substituted a different measure, which still allowed documentation under the Wrecked Vessel Statute (46 U.S.C.

§ 14). The Senate bill also delegated the responsibility for vessel documentation to the Coast Guard. *See* 126 *Cong.Rec.* at S15949 (1980) (remarks of Senator Cannon). The House accepted this substitute, and in effect reenacted the Wrecked Vessel Statute as it has existed since 1915. *Id.* at H12269.

### B. The Regulations.

In 1981, the Coast Guard proposed to revise the regulations pertaining to the documentation of vessels. 46 Fed.Reg. 56,318 (1981). Because the Wrecked Vessel Statute contains no requirement for the promulgation of any rules, only the Administrative Procedure Act's requirements governing "informal" or "notice and comment" rulemaking were adhered to. 5 U.S.C. § 553(c). The notice of proposed rulemaking ("NPR") required by 5 U.S.C. § 553(b) was duly published in the Federal Register on November 16, 1981. The NPR originally provided for a 60 day comment period, ending January 15, 1982, but the Coast Guard accepted comments as late as February 3, 1982. On June 24, 1982, the Coast Guard published the final rules accompanied by a discussion of all comments received. 47 Fed.Reg. 27,492 (1982).

The plaintiff knew about the proposed rulemaking. Indeed, the then-counsel for the plaintiff submitted comments on behalf of another client. Despite the proposed regulations' lack of provisions for participation by interested parties in determinations by a board of appraisers, and the lack of guidance as to such a board's methodology, the plaintiff submitted no comments.

The final Wrecked Vessel regulations were made effective on July 1, 1982. They were clearly promulgated in compliance with the Administrative Procedure Act ("APA"). The regulations, of which the pertinent parts are herein set forth, vary little from the statutory requirements:

§ 67.19–9   Wrecked vessels.

(a) Under the provisions of 46 U.S.C. 14, a wrecked vessel is one which:

(1) Has incurred substantial damage to its hull or superstructure as a result of

natural or accidental causes which occurred in the United States or its adjacent waters; and

(2) Has undergone, in a shipyard in the United States or its possessions, repairs equaling three (3) times the appraised salved value of the vessel.

(b) The determinations of the appraised salved value and that the repairs made upon the vessel are equal to three (3) times that value must be made by a board of three (3) appraisers. The Commandant will appoint the members of the board, and the cost of the board must be borne by the applicant ....

Note.—Calculation of appraised salved value will include consideration of the fact that the vessel, if in compliance with the Act, will attain costwise [sic] and fishery privileges. (46 C.F.R. § 67–19.9).

## C. The OGDEN–COLUMBIA's Application.

On March 31, 1982, a tow boat collided on the lower Mississippi River with a Japanese-built oil tanker, then sailing under the Liberian flag, known as the ARKAS (subsequently renamed the OGDEN–COLUMBIA).[1] The OGDEN–COLUMBIA was substantially damaged. On July 18, 1982, Avondale Shipyards, Inc. ("Avondale") a subsidiary of Ogden Corporation and at the time an affiliate of the intervenor-defendant Ogden Challenger Transport, purchased the tanker and bunkers (engine fuel) for $7.75 million.

On July 19, 1982, Avondale formally requested that the Coast Guard convene a board of appraisers pursuant to the Wrecked Vessel Statute, *supra.* (The Coast Guard's ARKAS file ("AF") at 1). Before such a foreign-built ship, (wrecked in U.S. waters, bought by U.S. citizens, and repaired in the U.S.), may be enrolled in the U.S. coastwise trade, the Coast Guard must determine that the repairs equal three times the salved value of the vessel. The Statute allows the Coast Guard to appoint a board of three appraisers to make such

determinations of the salved value of the ship and the cost of repairs. The costs of the Board's appraisal must be paid by the vessel's owner. 46 U.S.C. § 14.

On August 24, 1982, the Coast Guard convened such a board of three appraisers to consider the application of the OGDEN–COLUMBIA. In a letter to the Board members, Captain Verne E. Cox, the Coast Guard Officer in Charge, Marine Inspection in New Orleans, instructed the Board to determine if the vessel had incurred substantial damage to the hull and superstructure, and to establish the salved value of the vessel. In determining the salved value, the Board was instructed to consider that the vessel might obtain coastwise trading privileges. (AF 34). The letter also stated that the Board "may, but need not, consider" the $7.75 million purchase price "as relevant to the salved value of the vessel." (AF 34).

On August 30 and September 10, 1982, counsel for Manhattan Tankers wrote to the Coast Guard seeking to participate in the OGDEN–COLUMBIA proceedings. (AF 35–37, 38–39). The letters included, among other things, Manhattan Tanker's assertion that the Board should consider, in determining the salved value of the vessel, the cost of construction of a comparable tanker in a U.S. shipyard. Such a cost assertedly would be $140 million. (AF 38–39). The letters also requested that the Board carefully evaluate, in advance, the proposed repair costs because the ship was being repaired at a shipyard owned by the vessel's owner, Avondale. The Coast Guard determined that this information was not pertinent, and thus it did not convey these requests to the Board.

On September 15, 1982, the Board rendered a report which found, *inter alia,* that the salved value of the vessel was $3,500,000, and that the cost to repair it would almost assuredly exceed three times the salved value. (AF 41–42). The Coast Guard noticed that these initial determina-

---

**1.** Although during many of the events relevant to the tanker's application it was known as the ARKAS, the Court hereafter refers to it as the OGDEN–COLUMBIA.

tions by the Board contained some errors, and on September 21, 1982, the Coast Guard requested written clarification from the Board on three matters. (AF 49–50). Two of these matters are significant here. First, while the Coast Guard instructed the Board to make a finding of whether there was substantial damage to the tanker's hull or superstructure, (AF 34), the Board returned a finding of "substantial damage to hull, superstructure *and machinery*." (AF 41). Because damage to the machinery was not a proper consideration, the Coast Guard requested clarification.

Secondly, the Coast Guard requested the Board to explain its methodology in arriving at the salved value figure of $3,500,000, and whether that value included the consideration of the OGDEN–COLUMBIA's potential coastwise trading privileges.

The Board responded on October 4, 1982. In pertinent part, that revised report stated:

VESSEL CONDITION:
Vessel suffered substantial damage to hull and superstructure due to collision and fire.

VALUATIONS:
Subsequent to our joint conversations today with U.S. Coast Guard, Captain Vernon E. Cox, we submit the following methodology by which we arrived the salved value of $3,500,000.00:

a. Fair world marked [sic] value as confirmed by reputable brokers.    $11,500,000.00
b. Low bid for repairs was submitted by Japanese Shipyard in the amount of $8,000,000.00.
c. Therefore the salved value is $3,500,000.00.

These values above do not take into consideration the coastwise trading privileges for U.S. Flag vessels. Considering that at the time of the casualty this vessel was under U.S. Flag with coastwise trading privileges a fair and reasonable salved value would be in the amount of $7,000,000.00.

(AF 56). The Coast Guard notified Ogden of these figures, and requested Ogden to inform the Coast Guard when the repairs were completed. (AF 59).

The Coast Guard also notified counsel for Manhattan Tankers of the Board's findings. (AF 61). Manhattan Tankers petitioned the Secretary of Transportation for reconsideration of the Board's decision. (AF 61a). Manhattan Tankers contended that it had been denied a meaningful opportunity to participate in the decision-making; that the Board articulated no reasons for its determinations; that the Board did not consider the competitive impact of admitting the OGDEN–COLUMBIA into the domestic trade; and that the determinations were arbitrary and capricious. Those contentions were unsuccessful at that time, and Manhattan Tankers, in large part, repeats them now.

After these contentions went unanswered, plaintiff filed a lawsuit in this Court challenging the Coast Guard's determinations of substantial damage and salved value. *Manhattan Tankers, Inc. v. Andrew L. Lewis, et al.*, Civil Action No. 82–247 (D.D.C.). Because final administrative action had not yet been taken, and because the OGDEN–COLUMBIA had not yet been admitted to the trade, the Court (June Green, J.) ruled that the case was not ripe for review, and that the plaintiff had not suffered injury in fact to confer standing.[2]

During 1983, Avondale proceeded to repair the vessel. On October 21, 1983, the Board was reconvened to determine the cost of repairs. The Coast Guard directed the Board to establish the cost of:

those repairs which were necessary to return the vessel to navigation, including the cost of all work necessary to bring the vessel in to compliance with Coast Guard safety inspection and certification requirements.

(AF 114).

Pursuant to these instructions, the Board met on five occasions. (AF 125–26). On

---

2. As previously stated, in the present case, this Court has already determined that the plaintiff

has standing. *Manhattan Tankers v. Dole*, 587 F.Supp. 473 (D.D.C.1984).

November 9, 1983, it reported that the cost of all repairs was $38,361,000. However, the Board determined that over $2 million of those repairs were not strictly necessary. Therefore, the Board also returned a finding that the cost of those repairs necessary to bring the OGDEN–COLUMBIA into compliance with applicable Coast Guard requirements, and to return it to navigation, was $35,739,000. (AF 125).

On November 16, 1983, Mr. Joseph Yglesias, chief of the Coast Guard Merchant Vessel Documentation Division, transmitted the Board's report to Ogden and Manhattan Tankers, and announced the Coast Guard's decision as follows:

> The findings of the Board have been reviewed and accepted. The repairs put upon the ARKAS exceed three times the appraised salved value. Accordingly, the ARKAS will be entitled to documentation for and employment in the coastwise trade and for the fisheries upon compliance with all other requirements applicable to vessels that ought to be documented for that employment.

(AF 133).

The OGDEN–COLUMBIA, having received a certificate of documentation, and the MANHATTAN, plaintiff's tanker, are now engaged in the U.S. Alaskan oil trade. The MANHATTAN's charter expired in February, 1984, and it is actively seeking a new charter. While the MANHATTAN is in layup, the OGDEN–COLUMBIA received a three year charter, with options to renew, on January 20, 1984.

## ANALYSIS

### A. Manhattan Tankers was not Entitled to Participate in the Appraisal Proceedings.

The plaintiff asserts that it was denied any opportunity to be heard by the Board during the OGDEN–COLUMBIA's applica-

tion. This denial, plaintiff asserts, violated procedural fairness.[3] The plaintiff chiefly relies upon *Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, (D.C.Cir.1982).

In *Independent Tanker,* certain shipowners who were licensed for coastwise trade under the Jones Act (like Manhattan Tankers), challenged the admission of a new vessel into the domestic trade. That case, however, involved the vessel's admission into the trade through the Merchant Marine Act of 1936, not the Wrecked Vessel Act. Under the Jones Act, only ships built in the U.S. and owned by U.S. citizens may engage in domestic trade. 46 U.S.C. § 883. Congress also authorizes a construction subsidy, of up to 50 percent of the costs of construction, for vessels in the U.S. foreign maritime trade. *Id.* §§ 1151. Those subsidized vessels are prohibited by law from operating in the domestic trade. *Id.* § 1156.

The Maritime Administration, pursuant to its responsibility of administering the Merchant Marine Act, had decided to allow previously prohibited U.S. tankers to enter the domestic trade market upon repayment of their construction subsidy. By the time of the *Independent Tanker* case, the Supreme Court had upheld the power of the Administration to grant such releases of restrictions upon subsidy repayments, *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 597, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980), but it did not address how the Administration should exercise its broad discretion in accordance with the purposes of the Merchant Marine Act. *Id.*

After that decision, the Maritime Administration promulgated an interim rule detailing procedures to be followed in passing on a tanker's application to enter the domestic trade market by repaying its construction subsidy. The Court in *Indepen-*

---

**3.** As previously stated, the Wrecked Vessel Regulations provide for no intervention, by third parties such as the plaintiff, in a vessel's application. *See* 46 C.F.R. § 67.19–9. The plaintiff, in its complaint, attacked those regulations as arbitrary and capricious. Complaint ¶¶ 37–38. In its motion for summary judgment, however, the plaintiff has abandoned its attack on the regulations, but presses its challenge to the Coast Guard's decision to register the OGDEN–COLUMBIA.

*dent Tanker* held that the rulemaking procedures, which culminated in the interim rule, contravened the APA. 690 F.2d at 920. The Court then had to consider whether the Administration's decision to admit the tanker into the domestic trade could be upheld in light of the flawed rulemaking. *Id.* In invalidating the tanker's registration, the Court of Appeals relied heavily on the fact that the rule was not "outcome-determinative", that is, it was not a rule listing "a number of *necessary conditions,* conditions that had to be satisfied before" the vessel could be registered for domestic trade. *Id.* at 916. Because it was not an outcome-determinative rule, the Maritime Administration retained considerable discretion in deciding whether to lift a ship's restrictions. Under these circumstances, the Court held that the Administration must give current Jones Act operators "some opportunity ... to be informed of and comment upon the relevant evidence before the agency." *Id.* at 923.

The distinctions in the present case are clear. First, the interim rule in Independent Tanker required procedural protections in the form of "notice and comment" by interested parties. (Although the rule was procedurally invalid, the Court of Appeals held that the Maritime Administration was bound by its requirements. *Id.*) Thus, in holding that other Jones Act operators were entitled to notice and comment participation, the Court was merely holding that the Maritime Administration had to follow regulations. The regulations under the Wrecked Vessel Act, which were promulgated in compliance with the APA, do not require any notice and comment by interested parties. *See* 46 C.F.R. § 67–19.-9. In contrast to the Maritime Administration in *Independent Tanker,* the Coast Guard in the present case, by following the pertinent regulations, was not obligated to allow participation by other shipowners.

Secondly, the Wrecked Vessel Statute and Regulations, unlike the Merchant Marine Act and its regulations, *are* outcome determinative.[4] The Wrecked Vessel Act is a simple enrollment statute under which the Coast Guard's discretion is very limited. Under the operation of that statute, once the Coast Guard accepts the Board's determination that the statutory test has been satisfied, the Coast Guard may not deny the documentation for that vessel. *See, e.g.,* 52 *Cong.Rec.* 3959 (1915) ("if a vessel is repaired in the United States and three-fourths of its entire value has been put upon that vessel in the repairs in the shipyards of the United States that vessel ought to be admitted to registry in the United States as a matter of right.") (remarks of Representative Hardy).

Manhattan Tankers challenges this interpretation of the statute, asserting that it is not outcome-determinative. The plaintiff's argument is primarily based on the statute's use of the word "may"—that is, after the Commandant determines, with the aid of the Board, that the vessel has been three-fourths rebuilt, he "may" allow enrollment of the vessel. A fair reading of the statute, however, contradicts plaintiff's interpretation. In pertinent part, the statute declares that the Coast Guard *"may* issue a register or enrollment for any vessel ... *if it shall be proved to the satisfaction of the Commissioner ...* that the said repairs are equal to three times the salved value of the vessel." 46 U.S.C. § 14 (emphasis supplied). It is clear from the face of the statute that the word "may" is tied to the phrase "if it shall be proved to the satisfaction of the Commissioner [that the 'three-times' test is met]." Thus, once the Commissioner (now the Commandant of the Coast Guard) determines that the vessel has been three-fourths U.S. rebuilt, he *must* allow the vessel's enrollment in the coastwise trade. He has no discretion to thereafter deny the vessel's documentation.

**4.** A fundamental reason why the Wrecked Vessel Act involves an outcome-determinative test, unlike the Merchant Marine Act, lies in the distinction between the Marine Administration, the expert agency charged with the administration of the Merchant Marine Act, and the Coast Guard, charged with the administration of the Wrecked Vessel Act. This distinction is fully discussed *infra,* pp. 983–984.

The statute, therefore, is outcome-determinative.

As *Independent Tanker* stated, for administering such outcome-determinative statutes, the Coast Guard assumes a "fact-finding rather than a discretionary role," and the inquiry is "an objective and limited one." 690 F.2d at 916. Unlike *Independent Tanker*, where the relevant statute provided no guidance as to how the Maritime Administration should allow documentation of a vessel after a subsidy repayment, here there are "statutorily mandated procedures to which the court can turn." *Id.* at 922. The Court's inquiry here is whether the Coast Guard followed the statutory procedures, and the Court does not have to impose any "notice and comment" requirements as were deemed necessary in the very different circumstances of *Independent Tanker.*

■ In sum, the Wrecked Vessel Statute is merely an enrollment statute. Because the statute requires no "adjudication ... to be determined on the record", there is no APA requirement of notice and comment.[5] 5 U.S.C. § 554. The statute is outcome-determinative, and the formula for decision is simple: the Coast Guard may decide upon applications for documentation without substantial burden or expense to the government by appointing a board of three independent appraisers. These procedures contain adequate safeguards against arbitrary and capricious decisions. Although appraisal expenses are to be paid by the applicant, the objectivity and independence of the appraisers are preserved by prohibiting direct communications between board members and interested parties. 46

C.F.R. § 67–19.9. And, while the applicant supplies substantial information to the board, the veracity of that data is assured by the board's expertise and by the statute's harsh penalty for any false representations by the applicant: forfeiture of the vessel to the U.S. government. 46 U.S.C. § 14.

## B. The Coast Guard was not Required to Consider the Competitive Impact of the Registration of the OGDEN–COLUMBIA.

■ The plaintiff asserts that even after the Board makes the determinations of substantial damage, the salved value, and that the repairs meet the "three times" test, the Coast Guard must still consider the impact that the entry of the rebuilt tanker will have on the other ships in the coastwise trade. Because the Commandant did not consider this factor, plaintiff alleges that the Coast Guard's decision to allow documentation of the OGDEN–COLUMBIA was arbitrary and capricious. This argument misconceives the role of the Coast Guard, and the objectives of the Wrecked Vessel Statute.

Again, the plaintiff assumes that considerable discretion is vested in the Coast Guard because of the statute's use of the word "may". As previously detailed, because the statute is outcome-determinative, the Coast Guard in actuality has very little discretion in enrolling vessels pursuant to the Wrecked Vessel Act. More precisely, there is nothing in the statute or the regulations which compels the Coast Guard to measure the vessel's competitive impact.

---

5. Although plaintiff had no right to participate in the OGDEN–COLUMBIA proceedings, at least one of plaintiff's letters was indirectly passed on to the Board. In a lengthy August 30, 1982, letter to the Coast Guard, plaintiff urged, *inter alia,* that the Board make specific findings that the amount of repairs made by Avondale "be actually necessary to return the vessel to its predamaged condition and to meet Coast Guard inspection requirements." (AF 35). The Coast Guard considered this to be a worthwhile instruction, apparently for the reason that Avondale, while it had its ship in the yard, might want to perform more than the minimally re-

quired repairs on the tanker. The Coast Guard's instructions to the Board reflected this request, stating "[i]n addition to establishing the total cost of all repairs, the Board shall also establish the cost of those repairs which were necessary to return the vehicle to navigation, including the cost of all work necessary to bring the vessel into compliance with applicable Coast Guard safety inspection and certification requirements." (AF 114). Thus, even though the plaintiff was not entitled to directly participate in the OGDEN–COLUMBIA's appraisal, the plaintiff had indirect participation when the Coast Guard considered it proper.

The plaintiff asserts that if nothing in the Wrecked Vessel Statute requires the Coast Guard to consider the competitive impact of a new vessel, then the statute is inconsistent with subsequent documentation statutes. These alleged inconsistencies are found in the requirement of the Jones Act that merchandise in the coastwise trade be transported in "vessel[s] built in and documented under the laws of the United States," 46 U.S.C. § 883, and in the goal of the Merchant Marine Act to have a Merchant Marine composed of "suitable types of vessels constructed in the United States." Id. § 1101. The plaintiff claims that, read literally, these subsequent acts of Congress must repeal the Wrecked Vessel Act because that Act allows the documentation of ships not entirely built in the U.S.

It is clear that the plaintiff's reading of the statutes is overly technical. If a vessel meets the "three times" test of the Wrecked Vessel Act, the taint of foreign ownership is purged. Such a ship has been substantially built in the U.S., and thus there is no inconsistency with the domestic construction requirements of the later acts. Moreover, even if the statutes are inconsistent, consideration of competitive impact would not rectify these inconsistencies. The Commandant's consideration of whether a ship will affect the domestic trade market cannot, as a matter of logic, ensure that the ship has been built in the United States. Thus, the plaintiff can find no support in these subsequent Acts of Congress.

Plaintiff's reliance on *Shell Oil Co. v. Kreps*, 445 F.Supp. 1128 (D.D.C.1978), is also misplaced. In that case, which reached the Court of Appeals [6], and the Supreme Court [7] on different issues, a ship sought documentation under the Jones Act by repaying its construction subsidy.[8] The Court held that the Secretary had to consider the effects that the newly documented tanker would have on competition in the domestic trade market. 445 F.Supp. at 1143. However, in reaching that conclusion, the Court relied almost exclusively on the Jones Act and its legislative history. Such reasoning is irrelevant to the present case, which involves an entirely different statute, with a correspondingly different legislative history and regulations.

The Court in *Shell Oil* found that the Jones Act reflected a Congressional objective "to insulate unsubsidized domestic vessels from the debilitating effect of subsidized competition." 445 F.Supp. at 1142. The Wrecked Vessel Statute, of course, does not concern subsidies at all. While it is clear that the Jones Act and the Merchant Marine Act reflect a congressional intention to protect domestic shipowners, *e.g. Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 586–87, 100 S.Ct. 800, 808–09, 63 L.Ed.2d 36 (1980), the main beneficiaries of the Wrecked Vessel Act are the domestic shipyards, not tanker owners.[9] Thus, *Shell Oil* is slim authority for the proposition that the Commandant must consider the tanker's competitive impact.

The entire regulatory scheme of the Wrecked Vessel Act demonstrates that competitive effect is an irrelevant consideration. That Act is administered by the Coast Guard, an agency which is not equipped to perform the economic analysis that the plaintiff seeks. In contrast, the Merchant Marine Act of 1936, the statute involved in *Shell Oil* and *Independent Tanker*, is administered by the Maritime

---

**6.** *Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814 (D.C.Cir.1979).

**7.** *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

**8.** For an explanation of the operation of the Jones Act, see the Court's discussion of *Independent U.S. Tanker Owners Committee v. Lewis, supra*, pp. 980–982.

**9.** *See, e.g.,* 52 *Cong.Rec.* 3959 (1915) (statement of Representative Hardy): "I believe it is in the interest of the shipyards themselves that a vessel wrecked on our coast, if repaired in our yards at a cost of three-fourths of its value, should be admitted to registry in the United States, because if that is not done those ships, if possible, will be taken to foreign shipyards, to be repaired there, and the labor of repairing would thereby be lost to our shipyards."

984

Administration. That expert agency is designed to exercise the "substantial" discretion vested in the Secretary in administering the construction subsidy programs. *See Seatrain*, 444 U.S. at 586, 100 S.Ct. at 808. That agency has experience handling economic considerations, such as whether a new ship in the coastwise trade will significantly adversely affect the Jones Act fleet. *See, e.g.*, H.R.Rep. No. 199, 97th Cong., 1st Sess. 3–4, reprinted in 1981 *U.S.Code Cong. & Ad.News* 92, 93–94 (listing the functions of the Maritime Administration, including "[c]onducting research and development activities to improve the efficiency and economy of the merchant marine"). Because the Coast Guard does not have the economic expertise of the Maritime Administration, Congress, by enacting a simple, outcome-determinative enrollment statute, has not imposed upon the Coast Guard the responsibility of making economic determinations before registering a vessel. As the legislative history clearly demonstrates, when Congress enacted the Act in 1915, it was still concerned about the lack of expertise and manpower in the agency then charged with administering the statute, the Commerce Department. To relieve the agency from becoming embroiled in complex proceedings, Congress provided that the economic determinations could be made by an independent Board of expert appraisers. Congress made the inquiry a limited one for the agency by providing an outcome-determinative test, with a safeguard in the form of a mandatory penalty of forfeiture in the case of a misrepresentation to the Board. The proceedings would impose little cost on taxpayers because the applicant bears the expenses. Congress effectively reenacted this registry scheme in 1980. *See* 46 U.S.C. § 14. Despite this legislative history, the plaintiff would have

the Coast Guard inquire into such things as the competitive impact that a newly registered vessel would have on the domestic trade market. Because the Coast Guard has never before had such an obligation, it is not currently competent to perform this task. The statute and regulations simply do not envision such an inquiry.

*C. The Board was not Biased.*

■ The plaintiff claims that because the Board was to be paid by Avondale, and because the members of the Board were informed that they were to be paid by Avondale, the Board proceedings were not procedurally fair. However, the Wrecked Vessel Statute itself authorizes the exact process used in this case—a board whose expenses were borne by the applicant.[10] *See* 46 U.S.C. § 14. Manhattan Tankers' argument, therefore, must be an attack on the constitutionality of the statute itself.

In asserting this claim of bias, plaintiff relies on a number of criminal cases, chiefly *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 264 (1972). Such cases plainly do not apply to the instant case. In *Tumey*, a mayor's salary was in part determined by the number of fines he levied against criminal defendants. The Supreme Court held that this scheme violated due process. 273 U.S. at 531, 47 S.Ct. at 444. In *Ward*, the Supreme Court invalidated a scheme in which the mayor, before whom the petitioner had to stand trial for traffic offenses, was responsible for village finances and whose court, through fines, costs, and fees, provided a substantial portion of village funds. 409 U.S. at 61–62, 93 S.Ct. at 83–84.

---

**10.** Plaintiff's argument the the Coast Guard should not have informed the Board that Avondale would cover its expenses ignores the statutory requirement "[t]hat the expense of the appraisal ... shall be borne by the owner of the vessel." 46 U.S.C. § 14. Thus, restated, plaintiff's argument asserts that because the Board knew of the statutory requirement that Avondale would pay its expenses, the Board was

biased. It is clear, however, that the Board's familiarity with the law cannot constitute grounds for a due process violation. *Cf. Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) ("Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker).

The decisionmakers in *Tumey, Ward,* and in other cases cited by plaintiff[11], clearly faced pressure to decide cases a certain way. For example, the more fines the mayor levied in *Tumey,* the more salary he received. The Board in the present case, in contrast, had no interest in the outcome of their determination. Under this system, there is no temptation to render a finding one way or the other. *See, e.g., Dugan v. Ohio,* 277 U.S. 61, 65, 48 S.Ct. 439, 440, 72 L.Ed. 784 (1928) (no due process violation because the mayor who convicted the defendant received his salary whether he convicts or not). Moreover, there is no suggestion that the Board members were dependent on this appraisal for a substantial percentage of their income. Each was otherwise employed outside of the government. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 251, 100 S.Ct. 1610, 1617–18, 64 L.Ed.2d 182 (1980) ("Unlike in *Ward* and *Tumey,* it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties.") The only conclusion is that the system in the present case contained no impermissible bias.

The plaintiff also claims, citing no authority, that because the members of the Board were employed in the same community where Avondale's shipyard is located, the appraisers were subject to the influence of potential business relationships with Avondale. This potential for bias is simply too remote to violate due process.

### D. The Coast Guard Adequately Explained its Action.

■ The plaintiff asserts that neither the Board nor the Coast Guard provided reasoned explanations for three statutory determinations in this case: (1) that the OGDEN–COLUMBIA suffered substantial damage to its hull and superstructure; (2)

that the salved value of the vessel was $7,000,000; and (3) that the cost of necessary repairs was $35,739,000. However, as explained herein, each of these determinations was adequately reasoned and explained.

For a court to review agency actions, "the grounds upon which the administrative agency acted [must] be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). However, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

In the present case, the Board initially found substantial damage to the hull, superstructure, and machinery. (AF 41). Because machinery damage was an improper consideration, the Coast Guard, after careful scrutiny of the Board's determinations, required the Board to make another finding. (AF 49–50).

The Board then made a finding, in accordance with the Statute and regulations, of substantial damage to the hull and superstructure. (AF 56). Together with the new report, the Board submitted a detailed survey of the vessel, with thirty-six photographs indicating that the vessel indeed was damaged. Given the arm's-length purchase price of only $7.75 million, it would be hard to reach any other conclusion. The Court holds that the Coast Guard and the Board adequately explained the determination of "substantial damage."

The plaintiff more seriously challenges the Board's explanation of its determination of the appraised salved value.[12] The record plainly demonstrates, however, that the Coast Guard made certain that the Board explained (1) its methodology, and

---

11. See *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (magistrate paid for issuance, but not non-issuance, of warrants); *Brown v. Vance,* 637 F.2d 272 (5th Cir. 1981) (justices of the peace compensated according to number of cases filed in their courts creating incentive to rule for plaintiffs).

12. In addition to challenging the sufficiency of the explanation, the plaintiff also challenges the *methodology* used by the Board in arriving at the salved value. That issue is considered hereafter.

**986**

(2) whether the figure included consideration of coastwise trading privileges. (AF 47). The Board responded with an explanation of its methodology: it first determined the fair world market value, subtracted the cost of repairs, and the result was the salved value. The Board then determined, based upon its undisputed expertise, that the value should be upwardly adjusted to $7,000,000 considering coastwise trading privileges.

That the Coast Guard accepted this figure is not surprising. The figure approximates the $7.75 million arm's-length purchase price that the Board was allowed to consider. Although the tanker market may not be sufficiently expansive to generate a truly competitive price, the sale price in this arm's-length transaction is highly probative evidence of the vessel's value. Thus, the record is sufficiently complete to sustain the Coast Guard's acceptance of the Board's salved value determination.

The plaintiff also contends that the Coast Guard, and the Board, did not provide reasoned explanations for the determination that the necessary cost of repairs was $35,739,000. The plaintiff contends that the repair costs warranted careful scrutiny because the shipyard and the shipowner were affiliated.

There is, of course, nothing illegal about a shipowner repairing its own ship. The Board and the Coast Guard knew of Avondale's affiliation with its owner. And that independent Board met on five separate occasions, including once on board the ship and three times at the Avondale Shipyard, to appraise the repair costs. The Board reported that it conducted a thorough inspection of the vessel and relevant documentation. (AF 125–26). A Coast Guard representative attended the Board's deliberations, and was satisfied that the Board performed its functions in a conscientious manner. (AF 131).

The Board satisfied itself that, although the shipyard and the vessel owner were affiliated, the costs incurred were accurately stated. Given the Board's finding that over $2 million in repairs were not neces-

sary for compliance with Coast Guard regulations, it is clear that the Board carefully reviewed Avondale's charges. Moreover, given the salved value of $7 million, those repair costs easily satisfied the statutory "three times" test. Although the Court might prefer more detailed reasoning in finding these necessary repair costs, the Court finds the Board's determinations, and the subsequent acceptance by the Coast Guard, to be adequately explained.

### E. The Board Considered All Appropriate Factors in Arriving at the Salved Value Determination.

The plaintiff asserts that the Coast Guard and the Board, in determining the vessel's salved value, erred by failing to consider the cost of constructing such a substantially damaged vessel in the United States. In stating that such a cost must be considered, the plaintiff relies upon the Coast Guard's discussion of comments received concerning its proposed regulations of 1982. The Coast Guard's discussion is now found in the Preamble of the proposed Regulations. As seen upon reviewing those remarks in context, however, plaintiff's reliance is misplaced:

> One thread that seems to run through the legislative history is that the vessel as rebuilt shall be three-quarters (¾) United States built to overcome the "taint" of its foreign origin. The only way to ensure that result is to tie the appraised value of the wreck to the cost of construction in United States shipyards; i.e., by using the coastwise privilege as an element of the salved value appraisal. The market value of and fees charged by vessels enjoying coastwise privileges reflect the cost of United States construction. The appraised salved value should thus properly contain a similar cost factor.

47 Fed.Reg. 27,492 (June 24, 1982).

This information is not actually part of the regulations, and thus it imposes no obligations on the Coast Guard. Moreover, the Coast Guard in this case followed those remarks. It *did* consider the coastwise

trading privileges, and therefore the appraised salved value was "tied" to the cost of construction in the United States shipyards. The comments do not, as plaintiff implies, demand that the Coast Guard look to what it would cost a U.S. shipyard to build a substantially damaged ship such as the OGDEN–COLUMBIA. Obviously no shipyard would build such a vessel, so such a hypothetical cost would be meaningless.

■ The plaintiff next asserts that the Board should not have considered the purchase price of the OGDEN–COLUMBIA. However, nothing in the regulations or the statute precludes consideration of the vessel's purchase price. Certainly here, where it appears that the tanker was purchased after open bidding, the purchase price is the most persuasive evidence in the record of the value of the ship. The plaintiff cites one instance where the Coast Guard rejected consideration of the purchase of a wrecked tanker seeking registration under the Act. In those proceedings, the PROTECTOR ALPHA had been damaged while in the Columbia River. The vessel was sold for only $600,000. The Board of Appraisers, however, determined the salved value to be $10 million.

In the PROTECTOR–ALPHA case, some members of Congress complained about the high salved value figure, and Admiral Gracey of the Coast Guard responded to explain the decision. In a letter to Representative Mario Biaggi, Admiral Gracey noted that "the actual sale price should not control the application of the Wrecked Vessel Act." In addition, he stated that "when there is no market, which we believe to be the case in many wrecked vessel situations, the appraisers are to go through an analysis utilizing replacement cost, less depreciation, less damage to arrive at the salved value." The plaintiff urges that because this above-described method was not used in the case of the OGDEN–COLUMBIA, that application was improperly handled.

A closer analysis reveals, however, that the rejection of the sales price and use of a replacement cost approach in the circumstances of the PROTECTOR ALPHA case

have no pertinence here. Admiral Gracey's letter clearly intended that the replacement cost approach should be used where there is no proper market, such as where the sale price "is set by scrap dealers who are interested only in the value of the steel, and not by shipowners who would place a coastwise 'vessel value' on the wreck." There is no suggestion in the present case that the market conditions were dictated by such scrap dealers, or that the sale price of the OGDEN–COLUMBIA produced any "fantastic" results requiring resort to the hypothetical replacement cost approach. The PROTECTOR ALPHA was purchased for only $600,000, surely a fantastic price in light of its appraisal at $10 million. In contrast, the OGDEN–COLUMBIA was purchased for $7.75 million (including bunkers), but appraised, after consideration of coastwise trading privileges, at a value of $7 million. Finally, there is no indication that the purchase price "controlled" the Board's decision in this case. The Coast Guard carefully instructed the Board that it "may, but need not, consider this sale price [$7.75 million] as relevant to the salved value of the vessel." (AF 34).

■ The plaintiff also asserts that the methodology used by the Board in arriving at the salved value was inconsistent. However, while the Board was asked by the Coast Guard to explain its methodology, (AF 49), the Board did not state precisely how it arrived at that figure. The Court might, in general, desire more of an explanation of the Board's methodology, but in the present record there is plenty of evidence to support the Coast Guard's acceptance of the $7 million figure. The Coast Guard knew of the Board's estimate of the value of the vessel in good condition under American flag ($35–40 million (AF 41)), and of the actual cost of repairs necessary to bring the vessel up to U.S. standards ($35,739,000 (AF 125)). Relying on the Board's expertise, and allowing for a margin of error in either figure, the Coast Guard reasonably accepted the Board's $7 million salved value appraisal. This result, of course, also finds support in the arm's-

988

length purchase price of $7.75 million. With all of this highly persuasive evidence in the record, the Court cannot disturb the Coast Guard's decision despite any alleged errors in methodology.

### F. The Board Properly Determined the Repair Costs.

■ The plaintiff challenges the reasonableness of the repair costs charged by Avondale. Plaintiff's attack is based almost entirely upon the fact that Ogden repaired the vessel in its own shipyard. The record shows, however, that the Coast Guard adequately satisfied itself that the costs were reasonable and necessary. The Board, acting upon Coast Guard instructions, declared over $2 million in repairs unnecessary. Moreover, the statute has its own built-in safeguard, ensuring the reliability of the repair costs. If Avondale made any fraudulent misrepresentations to the Board, it faced forfeiture of the vessel. 46 U.S.C. § 14. Once the Board accepted these costs, the Coast Guard was ill-equipped to dispute the expert appraisal. As hereinbefore explained, the Coast Guard has neither the expertise, the manpower, nor the obligation to closely investigate the Board's suggested repair costs. The plaintiff, in essence, would have the Court convert the Wrecked Vessel documentation procedures into a new form of economic regulation, going well beyond the terms of the statute.

### CONCLUSION

Manhattan Tanker's objections to the Coast Guard's registration of the OGDEN–COLUMBIA stem from a fundamental misconception of the purposes of the relevant statute. Under the Wrecked Vessel Statute, a simple enrollment statute, the plaintiff has no right to participate in the registration proceedings. The Coast Guard has neither the expertise nor the resources to conduct any proceedings of the sort envisioned by the plaintiff. For that reason, Congress made the statute a simple one, and provided for a board of independent experts to make the statutory findings. If the Coast Guard, after a limited inquiry, accepts those findings, the applicant is entitled to have its vessel enrolled in the coastwise trade. Nothing more than that occurred in this case.

Moreover, the actions of the Board are beyond objection. The Board was not biased. It chose an acceptable methodology, relying upon proper factors, in reaching its findings. The Court will not disturb the findings of the Board, nor the decision of the Coast Guard to accept those findings and to permit the OGDEN–COLUMBIA to be enrolled in the coastwise trade. Accordingly, the Court has issued an Order of even date herewith denying the plaintiff's motion for summary judgment, and granting the joint motion of the defendant and the intervenor-defendant for summary judgment.