**SEA–LAND SERVICE, INC., Appellant,**

v.

**Elizabeth Hanford DOLE, Secretary of Transportation, et al.**

**No. 82–1712.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1983.

Decided Dec. 23, 1983.

Edward M. Shea, Washington, D.C., with whom John E. Vargo, Washington, D.C., was on the brief for appellant.

Charles D. Ossola, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty., and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee, Secretary of Transportation, et al.

Robert A. Peavy, Washington, D.C., for appellee, Waterman Steamship Corporation.

Before EDWARDS, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Sea-Land Service, Inc. ("Sea-Land"), appeals from a district court decision granting summary judgment in favor of appellees in an action brought under the Administrative Procedure Act and the Merchant Marine Act of 1936. Appellant, plaintiff below, contends that appellee the Secretary of Transportation[1] violated § 605(c) of the Merchant Marine Act of 1936, 46 U.S.C. § 1175(c) (Supp. V 1981), by including in an operating differential subsidy contract with appellee Waterman Steamship Company ("Waterman") permission for the subsidized vessels to call on certain ports off the subsidized route without holding a hearing to examine the sufficiency of existing service on the routes thereby affected.

I

The Merchant Marine Act of 1936, ch. 858, 49 Stat.1985 (codified as amended at 46 U.S.C. §§ 1101–1295g (1976 & Supp. V 1981)), was enacted, according to its declaration of policy, in order to foster an efficient, modern, American-owned and -operated merchant fleet, able to carry a substantial portion of American export and import trade, and able to serve as a naval auxiliary in time of war. Id. at § 1101. As amended, the statute establishes a program of construction-differential subsidies, authorizing the Secretary of Transportation to grant a subsidy of up to 50 percent of the cost of constructing new American-flag merchant ships, in exchange for assurances that the subsidized vessels will be used only in foreign commerce. Id. at §§ 1151–1161. The Act also establishes a system of operating-differential subsidies ("ODS"), id. at §§ 1171–1185, the procedural requirements of which are at issue in this case.

The ODS program arose from the Congressional belief that, without subsidy, the higher operating costs of American vessels, particularly their labor costs, would render them uncompetitive and drive them out of the merchant marine market. See H.R. Rep. No. 1277, 74th Cong., 1st Sess. 13 (1935). Accordingly, the Secretary of Transportation is authorized to enter into contracts granting financial aid to certain vessels operated in United States foreign commerce. 46 U.S.C. § 1171(a) (Supp. V 1981). The ODS program is administered by the Department of Transportation's Maritime Administration, through its Maritime Subsidy Board.

To receive an ODS, an operator must file an application satisfying § 601 of the Act, id. at § 1171 (Supp. V 1981), which imposes financing, ownership, and vessel equipment conditions, and requires that the subsidy be used for operation in an essential service. For the purposes here relevant, the Act defines "essential services" as those services, routes and lines that are "determined by the Secretary of Transportation to be essential for the promotion, development, expansion, and maintenance of the foreign commerce of the United States," taking into account various specified factors, including "the intangible benefit the maintenance of any such line may afford to the foreign commerce of the United States, to the national defense, and to other national requirements."[2] 46 U.S.C. § 1121(a) (Supp. V 1981). Section 605 of the Act contains provisions specifically excluding certain ves-

---

1. The Secretary of Commerce and the Maritime Subsidy Board, then a part of the Department of Commerce, were the original government parties to this controversy. After they took the actions giving rise to this appeal Congress passed the Maritime Act of 1981, Pub.L. No. 97–31, 95 Stat. 151 (codified in scattered sections of U.S.C., largely Title 46 (Supp. V 1981)), which transferred the Secretary of Commerce's pertinent duties, the Maritime Administration, and related agencies, to the Department of Transportation.

2. "Essential services" also include bulk cargo carrying services that the Secretary believes should be provided by United States flag vessels (because of foreign commerce, national defense or other national requirements), without regard to the particular routes served. Id. at §§ 1171(a), 1121(b).

sels from ODS subsidy, including the following provision that is central to the present case.

> No contract shall be made under this subchapter with respect to a vessel to be operated in an essential service served by citizens of the United States which would be in addition to the existing service, or services, unless the Secretary of Transportation shall determine after proper hearing of all parties that the service already provided by vessels of United States registry is inadequate, and that in the accomplishment of the purposes and policy of this chapter additional vessels should be operated thereon . . . .

46 U.S.C. 1175(c) (Supp. V 1981).

In 1973, Waterman Steamship Corporation applied for an ODS to operate subsidized shipping service for a required number of sailings on Trade Route 21, which runs between the United States Gulf Coast and United Kingdom and European ports. It also sought the privilege of making stops, with subsidy, on Trade Routes 5–7–8–9 and 11, which describe service from North and South Atlantic ports to United Kingdom and European ports, and Trade Route 6, which runs between United States North Atlantic ports and Scandanavian and Baltic ports. In 1975, Waterman filed a separate application seeking an ODS that would require it to serve Trade Routes 5–7–8–9, 6, and 11. In 1977, after published notice of these applications, comments in opposition by other shipping companies, and public hearings, an administrative law judge made the § 605(c) finding that United States flag service on all the trade routes at issue was inadequate, and that Waterman's proposal would serve the purposes of the Act. *Waterman Steamship Corp.,* 17 S.R.R. (P & F) 25, 72 (M.S.B.1977) (Initial Decision of ALJ). In September of 1978, the Maritime Subsidy Board agreed with the administrative law judge that service on Trade Route 21 was inadequate, and that § 605(c) was not a bar to Waterman's additional service on that route. The Board found, however, that United States flag service on Trade Route 5–7–8–9 was adequate, and that although existing service on Trade Routes 6

and 11 was inadequate, Waterman had not proven its service on those routes would further the policies of the Act. *Waterman Steamship Corp.,* 18 S.R.R. (P & F) 925, 945 (M.S.B.1978).

On September 18, 1978 Waterman responded to the Board's decision by revising its application for ODS on Trade Route 21, changing the request for permissive *subsidized* calls at the ports served by Trade Routes 5–7–8–9, 6, and 11 to a request for permissive calls on a nonsubsidized deviation basis to load and discharge cargo. (Waterman also sought reconsideration of the Board's prior denial of ODS on those routes, in petitions dated September 19 and 21, 1978; by order dated November 15, 1978, those petitions were denied. *Waterman Steamship Corp.,* 18 S.R.R. (P & F) 1257 (M.S.B.1978).) On November 21, 1978 the Board granted Waterman's revised application by letter. The Board noted that its determination on the original application satisfied the requirements of § 605(c), given that Waterman's subsidy was to be limited to operations on Trade Route 21. The Board's letter formed the basis for the ODS contract, specifying the subsidy for Trade Route 21, authorizing nonsubsidized service on the other trade routes, and describing how the subsidy was to be allocated among subsidized and nonsubsidized operations of the same vessel. Sea-Land's petition to reconsider the permission to conduct nonsubsidized operations was denied. *Waterman Steamship Corp.,* 18 S.R.R. (P & F) 1550, 1552 (M.S.B.1979).

■ Since the Merchant Marine Act contains no special provision for judicial review of subsidy determinations, Sea-Land brought suit against the government appellees in the United States District Court for the District of Columbia under the so-called nonstatutory review provision of the Administrative Procedure Act, 5 U.S.C. § 703 (1982). Waterman was permitted to intervene as a party defendant. Sea-Land has standing because it operates vessels upon some of the trade routes on which the nonsubsidized operations may be conducted,

and will thus suffer competitive harm as a consequence of the Secretary's action allegedly taken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

In this appeal from the District Court's award of summary judgment, Sea-Land contends that the Board's action violated § 605(c) which, it claims, requires the Board to hold hearings to investigate the adequacy of existing service before entering into a contract that authorizes even *non*subsidized operations by contract vessels on essential trade routes.

## II

The present dispute centers upon the meaning of the phrase in § 605(c) that "[n]o contract shall be made under this subchapter with respect to a vessel to be operated in an essential service . . . unless the Secretary of Transportation shall determine after proper hearing of all parties that the service already provided by vessels of United States registry is inadequate, and that . . . additional vessels should be operated thereon." More specifically, the issue is whether the phrase "with respect to a vessel to be operated in an essential service" refers only to that operation which is the very subject of the contract (i.e., the subsidized operation) or rather embraces all operations specifically permitted by the contract, including (as in the present case) nonsubsidized operations on essential routes.

We note at the outset what this case does *not* involve:

First, it does not involve an assertion that the hearing is necessary in order to prevent what is known as "subsidy leakage"—that is, the use of subsidy funds intended to foster shipping on one route in order to underwrite expenses on another route. Waterman's ODS contract specifically pro-

vided that the subsidy would be reduced to account for deviations from Trade Route 21 to ports not on the subsidized route. In the district court, Sea-Land contested the adequacy of this provision to prevent subsidy leakage—but that was for the purpose of demonstrating the injury necessary for standing (a point for which we do not think demonstration of leakage is needed) rather than as the basis for asserting that a hearing was necessary. We would in any event find it impossible to rely upon the potential of subsidy leakage as plausible justification for the asserted hearing requirement, since leakage could as readily occur through the subsidized carrier's use of a *different* vessel on the nonsubsidized route, which would clearly not be subject to the hearing requirement. Where Congress was concerned with subsidy leakage, as it was with regard to the diversion of subsidy for foreign operations to domestic operations, it specifically established restrictions that prevented all operations of the subsidized contractor in the other trade. *See* 46 U.S.C. § 1223(a) (Supp. V 1981).

Second, the present case does not involve the issue whether the Secretary can permit nonsubsidized operations of contract vessels without considering the impact upon essential services thereby affected. The Secretary has not asserted the irrelevance of such impact to her determination, and the appellant has not asserted that she ignored it; we therefore express no opinion on that point.[3] The sole issue presented is whether, assuming the relevance of such impact, it must be evaluated in a public hearing as required by § 605(c). If so, the contract issued here, revised from the initial request (to permit nonsubsidized operations in essential services) after the § 605 hearing was held, would be invalid. If not, the original hearing applicable only to the subsidized route sufficed.

---

**3.** Of course our holding that the hearing requirement of § 605(c) does not apply to nonsubsidized operations on essential services necessarily means that the substantive standards of § 605(c) for determining impermissible im-

pact do not by their terms apply to such operations. It may be asserted, however, that equivalent standards or lesser standards should be inferred from the totality of the Act.

Our task in a case of this sort is not to provide our own original construction of the governing statute, but rather to determine whether the agency's construction is "sufficiently reasonable" to be allowed. *See Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *Train v. Natural Resources Defense Council,* 421 U.S. 60, 70, 95 S.Ct. 1470, 1477, 43 L.Ed.2d 731 (1975). Both as a matter of linguistics and as a matter of statutory policy we must conclude that condition exists. It is reasonable if not inevitable to construe the statutory phrase "[n]o contract shall be made ... with respect to a vessel to be operated in an essential service" to mean "no contract shall be made for the provision of subsidy to a vessel for operations in an essential service"—in which case the subsequently expressed hearing requirement would refer only to the route for which the subsidy was being conferred, and not to any other essential service for which the vessel might be given operating rights. As for statutory policy: We will accept, for the sake of argument only, Sea-Land's view that the purpose of the statutory scheme is not merely to prevent subsidies from *causing* overtonnaging of essential service routes, but also to use subsidies to *prevent* overtonnaging of such routes (by prohibiting unneeded service by vessels subsidized for other routes). Even on that assumption, it is still reasonable to believe that the former policy, being the stronger and more explicit, was meant to be implemented through mandatory public hearings under § 605(c), whereas the latter was left to be implemented through discretionary hearings and more informal means. The position that the hearing requirement does not apply to nonsubsidized operations is supported by the fact those operations go unaddressed in all the other provisions of this subchapter.

We do not agree with Sea-Land's contention that the Secretary's interpretation is inconsistent with the Maritime Administration's General Order 80, 22 Fed.Reg. 2911 (1957), codified at 46 C.F.R. § 281.11–.17 (1982). That Order governs a contract ves-

sel's nonsubsidized voyages (in essential services) not specifically authorized by the ODS contract. It provides that, in considering applications for approval of such voyages, the Maritime Administrator "*may call* an informal public hearing" (emphasis added) when, in his judgment, "it appears that the individual non-subsidized voyages for which approval is requested are forming or tending to form a pattern leading to the establishment of a regular non-subsidized service, or, if in the case where such a non-subsidized service has already been established, it appears that the operator proposes to continue such service indefinitely." 46 C.F.R. § 281.13(a). The hearing is not only optional but is stated to be "for advisory purposes only." *Id.* Far from supporting the position that § 605(c) requires a hearing for nonsubsidized operations in essential services, General Order 80 tends to establish the opposite. For it enables the same operations which, under Sea-Land's interpretation of § 605(c), would require a public hearing if specifically included in the ODS contract, to be adopted apart from the contract without any hearing at all. Since such a scheme would be senseless if not positively unlawful, General Order 80 seems to assume that no hearing is required under § 605(c).

The Secretary's interpretation of § 605(c) likewise comports with the Board's case precedent. The Board cases Sea-Land cites in support of a hearing requirement involved requests for additional *subsidized* service. *Additional Subsidized Service on Trade Routes 29 & 17,* 4 M.A. 60 (M.S.B. 1974); *Lykes Brothers Steamship Co.,* 2 M.A. 57 (M.S.B.1966); *American President Lines, Ltd.,* 1 M.A. 143 (M.S.B.1963) (Atlantic Straits Service). The Board has specifically said that "the sole concern of Title VI, and particularly Section 605(c), is to avoid subsidizing an essential service that is already adequately served." *In Re National Shipping Corporation ODS Application,* 4 M.A. 189, 191 (M.S.B.1974). *See also Additional Subsidized Service, supra,* 4 M.A. at 62. Similarly, the cases of this court that Sea-Land cites for the broader proposition

that the purpose of § 605(c) is to prevent overtonnaging all involved overtonnaging that would result from additional *subsidized* services. *Sea-Land Service, Inc. v. Kreps,* 566 F.2d 763 (D.C.Cir.1977); *Sea-Land Service, Inc. v. Connor,* 418 F.2d 1142 (D.C.Cir. 1969); *see also Aeron Marine Shipping Co. v. United States,* 695 F.2d 567 (D.C.Cir. 1982).

· The District Court's entry of summary judgment in favor of appellees is

*Affirmed.*