MANHATTAN TANKERS,
INC., Appellant,

v.

Elizabeth H. DOLE, Secretary of
Transportation, et al.

MANHATTAN TANKERS, INC.

v.

Elizabeth H. DOLE, Secretary of Trans-
portation, et al. Ogden Challenger
Transport, Inc., Appellant.

Nos. 84–5886, 84–5929.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 15, 1986.

Decided April 11, 1986.

William E. McDaniels, with whom Kevin
T. Baine and F. Lane Heard, III, Wash-
ington, D.C., were on brief, for appellant in

No. 84–5886 and cross-appellee in No. 84–5929.

Michael J. Ryan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee U.S. in No. 84–5886 and cross-appellant in No. 84–5929.

Hugh N. Fryer, with whom Philip W. Buchen and Craig S. King, Washington, D.C., were on brief, for appellee Ogden Challenger Transport, Inc. in No. 84–5886 and cross-appellant in No. 84–5929.

Before ROBINSON, Chief Judge, and STARR and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

As this Nation's dependency upon foreign oil increased over the years, tankers transporting oil to the United States prosperously plied their international routes. The coastwise trade of the United States, as from the earliest days of our Republic, continued as the exclusive preserve of ships that were U.S. owned and U.S.-built. In the wake of the Arab oil embargo of 1973–74 and other shocks to the international oil market, demand for international carriage of oil dropped markedly; meanwhile, the discovery of substantial quantities of oil in Alaska, combined with legislation forbidding its sale abroad, created a significant expansion in the U.S. coastwise trade. Shipping firms whose vessels were disqualified from carrying domestic commerce thereupon undertook to rid vessels of foreign "taint" in order to render those bottoms legally competent to engage in the coastwise trade.

The case before us involves one legal avenue of transforming a vessel formerly limited to foreign trade into a *bona fide* member of the U.S. domestic fleet. That method is the Wrecked Vessels Statute, a one-sentence measure codified at 46 U.S.C. § 14 (1982).[1] Under its terms, a vessel built abroad which is "wrecked on the coasts of the United States or her possessions or adjacent waters" can enter the ranks of U.S. vessels if two prescribed conditions are met. *First,* the vessel must be "purchased by a citizen or citizens of the United States"; *second,* the wrecked vessel must be "repaired in a shipyard in the United States or her possessions ... [so] that the said repairs put upon such vessel [ ] are equal to three times the appraised salved value of the vessel." *Id.*

In the events that gave rise to this litigation, Avondale Shipyards, Inc. purchased a Japanese-built tanker, the ARKAS (subsequently renamed the OGDEN COLUMBIA), that had collided with a towboat on the Mississippi River.[2] Avondale thereafter invoked the Wrecked Vessels Statute, seeking enrollment by the U.S. Coast Guard of the repaired vessel under that measure. Avondale's effort proved successful, over the vigorous objections of a prospective competitor already plying the coastwise trade, Manhattan Tankers, Inc. Failing in its efforts before the Coast Guard to torpedo the ARKAS' documentation as a U.S. vessel, Manhattan Tankers filed suit in United States District Court against the Secretary of Transportation, among others, seeking to overturn the process by which its unwelcomed competitor had entered the coastwise trade. That challenge failed below, as the District Court granted the Government's motion for

---

**1.** This statute has a venerable history. The original version was enacted in 1852 and the current measure dates back to 1915.

Another route for entering the coastwise trade, of more recent vintage, exists for U.S.-owned ships built in the United States with the aid of federal construction subsidies. Although such ships are generally limited to foreign trade, both temporary and permanent suspensions of the prohibition on domestic trade may be obtained under certain circumstances. *See* 46 U.S.C. app. § 1156 (Supp. I 1983) (limited suspension provision); *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980) (recognizing implicit statutory authority for permanent suspension).

**2.** The vessel's ultimate purchaser, Ogden Challenger Transport, Inc., joined the litigation before the District Court as an intervenor.

summary judgment. For the reasons that follow, we affirm.

I

In 1982, the Coast Guard promulgated regulations designed to ensure that vessels enrolled under the Wrecked Vessels Statute were indeed qualified to enter the ranks of those built in American shipyards. Specifically, the regulations fleshed out the statutory requirement that the repairs to the vessel exceed three times the "appraised salved value." A primary loophole that the 1982 regulations were designed to close was the failure in the appraisal process to account for future coastwise trading privileges of the rebuilt vessel, an omission which had apparently resulted in unjustifiably low appraisals of wrecked vessels' value. The unhappy consequence of low appraisals was that foreign vessels could undergo relatively little repair work in U.S. shipyards and then "compete unfairly with more expensive United States built vessels" in the coastwise trade. 47 Fed.Reg. 27492 (1982). The remedy for this perverse incentive to wreck a foreign-built vessel on United States shores was to use "the coastwise privilege as an element of the salved value appraisal." *Id.* In addition, to avoid modest damage transforming a vessel into a "wrecked" condition, the regulations required that, to qualify under the statute, a vessel must have sustained "substantial damage to its hull or superstructure." 46 C.F.R. § 67.19–9 (1985).

Shortly after the regulations were promulgated, Avondale purchased the ARKAS for $7.75 million and promptly requested the Coast Guard to determine that the vessel was potentially qualified for enrollment under the Wrecked Vessels Statute. As expressly authorized by the statute and required by the regulations, the Coast Guard convened a three-member, outside Board of Appraisers to make the requisite findings. Within days after the Board's convening, Manhattan Tankers, through counsel, tendered to the Coast Guard a written request to participate in the Board's proceedings and requested "that certain information relating to the damage to the ARKAS, its salved value, and the cost of repairs be brought to the attention of the Board." Brief for Manhattan Tankers at 11. The efforts were unavailing, however, as the Coast Guard declined to permit adversarial participation in the Board's proceedings and dismissed Manhattan Tankers' proffered information as extraneous.

Soon thereafter, the Board rendered its first report, concluding that the salved value of the ARKAS was $3.5 million. The Coast Guard, however, found the report unsatisfactory for two reasons. *First,* the Board's determination of substantial damage to the vessel rested in part on a finding of damage to the machinery, whereas the regulations limit the substantial damage inquiry to the hull or superstructure. *Second,* it was not clear from the Board's brief report that the recently articulated factor of coastwise trading privileges had been taken into account in determining the vessel's appraised salved value.

Returning to the drawing boards, the Board confessed error in not having considered coastwise trading privileges and came forward with a revised salved value of $7 million. The Board also stated expressly that the ARKAS had sustained substantial damage to its hull and superstructure due to collision and fire.

The repairs were then undertaken by Avondale at its shipyard in New Orleans, after the completion of which the Board was reconvened to determine the cost of the repairs. In late 1983, the Board reported that the total cost of all repairs to the ARKAS was slightly in excess of $38 million and that the cost of repairs necessary to bring the vessel into conformity with applicable requirements was $35.7 million. The Board's findings were reviewed and accepted by Joseph A. Yglesias, Chief of the Coast Guard's Merchant Vessel Documentation Division.

Unenamored of the result reached and chagrined by the procedures employed by the Coast Guard in documenting the AR-

KAS, Manhattan Tankers brought suit contending that (1) it was improperly denied the right to participate in the appraisal proceedings; (2) the appraisal proceedings were tainted by the potential for bias on the part of the Board members; (3) the Board and Coast Guard provided no reasoned explanation for their decisions; and (4) the Coast Guard's decision to accept the Board's finding was arbitrary, capricious and an abuse of discretion.

In a thorough opinion, 596 F.Supp. 974 (D.D.C.1984), the District Court rejected Manhattan's various challenges. Manhattan Tankers' only specific authority for the asserted right of competitors to participate in the appraisal proceeding, *Independent U.S. Tanker Owners Committee v. Lewis* (ITOC), 690 F.2d 908 (D.C.Cir. 1982), was deemed inapposite. The District Court also rejected the claim that bias infected the Board of Appraisers' proceedings, concluding that the Board was expressly authorized by statute and that its use was consistent with the due-process requirement of an impartial decisionmaker. Plaintiff's substantive attacks on the Coast Guard's decision were equally unavailing. The District Court found that the bases for the Board's and Coast Guard's determinations were sufficiently disclosed to permit effective judicial review. Moreover, the Coast Guard's decision to accept the Board's findings, after its own inquiry, was held consistent with the statutory and regulatory scheme at issue and otherwise in accordance with law.

## II

Because we agree in the main with the District Court's analysis, we will address only in brief Manhattan Tankers' more substantial arguments.[3] First, appellant contends that existing competitors in the coastwise trade are entitled to participate in appraisal proceedings under the Wrecked Vessels Statute. We disagree. No support for such a procedural right is to be found in either the specific statutory provision or the regulations governing the documentation of wrecked vessels. Nor can such a right be divined in the general requirements of the APA. To the contrary, the statutory and regulatory scheme at issue was especially crafted to minimize the costs and burdens of administration. The statute prescribes a set formula for determining documentation eligibility and authorizes the governing agency (now the Coast Guard) to delegate any necessary fact-finding to a three-member Board of Appraisers. The costs of the Board's appraisal are statutorily imposed on the applicant. Moreover, the statute does not provide for an adversarial process in which the veracity of applicants' submissions are to be tested; instead, the measure calls for a complete forfeiture of the applicants' ves-

---

**3.** The District Court, in a separate opinion, held that Manhattan Tankers had standing to bring suit. 587 F.Supp. 473 (1984). On appeal, the Government no longer challenges standing; only intervenor Ogden Challenger Transport, Inc. continues to press the issue. Even Ogden, however, does not contest the District Court's conclusion that the competitive harm to Manhattan Tankers flowing from enrollment of the ARKAS satisfies Article III standing requirements, a conclusion that was quite plainly correct. *See Sea-Land Service, Inc. v. Dole,* 723 F.2d 975, 977–78 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 103, 83 L.Ed.2d 47 (1983). *See generally Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Rather, Ogden argues that Manhattan Tankers' claim should be dismissed as not "arguably within the zone of interests to be protected" by the Wrecked Vessels Statute. *Association of Data Processing Ser-*

*vices Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Although the exact contours of the "zone of interests" test may be elusive, Manhattan Tankers' claim clearly satisfies the test. The Wrecked Vessels Statute, on its face, provides protection for American shipowners through the U.S.-ownership requirement. Moreover, the three-fourths U.S. rebuilt requirement also *arguably* serves, in part, to ensure that U.S. shipowners do not face an unfair competitive disadvantage from foreign-built vessels. *See* Preamble Discussion of Regulations Implementing the Wrecked Vessels Statute, 47 Fed.Reg. 27492 (1982); *see also* 36 Op. Att'y Gen. 302, 310–11 (1930) (construing Jones Act and Wrecked Vessels Statute to reflect a consistent policy) *and Marine Carriers Corp. v. Fowler,* 429 F.2d 702, 708 (2d Cir.1970) (the Jones Act seeks "to protect American shipping industry already engaged in the coastwise trade"), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

sel and materials aboard as a penalty for any material misrepresentations advanced in order to obtain documentation.

Notwithstanding the complete statutory and regulatory silence in this respect, Manhattan Tankers invites this court to engraft onto the Wrecked Vessels statutory scheme a right of participation on the part of affected competitors. The sole authority advanced to support that request is our prior decision in ITOC.[4] As we shall now see, neither the holding nor the reasoning in ITOC requires us to impose a procedural right in this setting. We therefore decline Manhattan's invitation to engage in this act of judicial creativity. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

In *ITOC,* the agency charged with administering the statute at issue there had promulgated a rule granting current participants in the coastwise trade an opportunity to comment on applications to enter that market. In holding that domestic shippers should have been allowed opportunity for notice and comment, the *ITOC* court was thus affirming the well-established principle that agencies must abide by their own rules. That principle has no application here for the straightforward reason that the pertinent regulations, as we have just seen, do not provide for participation by other shipowners.

Moreover, contrary to appellant's assertions, *ITOC* did not purport to establish that participation by interested nonparties is required in all informal adjudicatory proceedings. *Compare ITOC, supra,* 690 F.2d at 917 ("[P]articipation by nonparties who may be affected by the outcome is [not] automatic ... in informal adjudication.") *with id.* at 922–923 (noting *"trend"* of the courts to require as part of informal adjudication "some opportunity for interested parties to ... comment upon the relevant evidence before the agency") (emphasis added) (footnote omitted). Rather, the *ITOC* court stated that it may be appropriate to impose "some minimum procedures" in the context of an informal adjudication where "necessary to provide a record adequate for the court to perform its review." *Id.* at 922; *see* K. Davis, ADMINISTRATIVE LAW TREATISE § 14.24 (2d ed. 1980), *cited in* 690 F.2d at 922 n. 69. The issue of judicially-created procedural rights arose in *ITOC* because the court was reviewing an agency action not explicitly authorized by statute. We do not face that issue here, however, inasmuch as the agency action under challenge is expressly contemplated by statute and governed by "statutorily mandated procedures to which the court can turn." 690 F.2d at 922.[5]

■ We also agree with the District Court's disposition of Manhattan Tankers' substantive challenges to the Coast Guard's enrollment of the ARKAS. Manhattan contends that the agency's action

---

4. Manhattan Tankers also argues that participation by other shipowners was "required to protect against the potential for abuse that the Coast Guard's procedures created." Brief for Manhattan Tankers at 42. We agree, however, with the District Court that the procedural system ordained by both statute and regulation and followed in this case "contained no impermissible bias." 596 F.Supp. at 985; *see id.* at 984–85 (noting that the board-of-appraisers system, unlike adjudicatory schemes held to violate due process, did not grant the decision-maker a direct financial interest in the outcome of the determination); 982 & n. 5 (noting that direct communications between applicant and the Board were prohibited and that the Coast Guard relayed communications to the Board when it deemed proper); 986 and 988 (noting that the Board independently examined repair costs sub-

mitted by shipyard affiliated with applicant to determine if they were reasonable and necessary).

5. Satisfied that *ITOC* is properly distinguished on this ground, we need not and do not consider the District Court's view that the *ITOC* court's discussion of the propriety of judicially-imposed procedural rights does not apply to the administration of "outcome determinative" statutes. 596 F.Supp. at 981–82. A *fortiori,* we do not reach the question whether the Wrecked Vessels Statute is "outcome determinative," that is whether it would permit the Coast Guard to exercise discretion in denying documentation even where it is determined that the applicant had satisfied the objective conditions for enrollment.

should be invalidated because the administrative record lacks "an adequate statement of the *basis* for [the Coast Guard's] decision." Brief for Manhattan Tankers at 45. In our view, however, the articulated basis for the decision to enroll the ARKAS is sufficient because "[e]nough has been 'put of record to enable us to perform the limited task which is ours.'" *Alabama Great Southern Railroad Co. v. United States,* 340 U.S. 216, 228, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951) (quoting *Eastern-Central Motor Carriers Association v. United States,* 321 U.S. 194, 212, 64 S.Ct. 499, 508, 88 L.Ed. 668 (1944)); *see Iowa State Commerce Commission v. Office of Federal Inspector,* 730 F.2d 1566, 1577–78 (D.C. 1984).

The standards and policies that guided the agency's decision are in no wise enshrouded in mystery. *Cf. SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action....."). To the contrary, those standards and policies are expressly set forth in the governing statute and regulations. The statute itself prescribes the key criterion for documentation: a foreign-built wrecked vessel must undergo repairs in a U.S. shipyard totaling three times its appraised salved value. The Coast Guard has, moreover, exercised its rulemaking powers to establish more specific rules to govern the enrollment process. In addition to imposing the requirement of substantial damage to hull or superstructure, the Coast Guard clarified the manner in which appraised salved value was to be determined. The 1982 regulation made clear that the attainment of coastwise trade privileges must be considered as part of salved value. At the same time, the Coast Guard decided that, in order to achieve fair and consistent treatment of applications, other questions of valuation methodology and the resolution of factual issues should be resolved by an independent board of three expert appraisers who would apply normally accepted standards followed in the maritime industry. *See* 47 Fed.Reg. 27492 (1982); J.A. at 285. Regardless of whether such a delegation might be deemed improper for an agency charged with a different statutory mandate, the Wrecked Vessels Statute clearly authorizes the Coast Guard to defer to the findings of a Board of Appraisers with respect to relevant factual determinations, including appraised salved value, absent plain error, fraud or contravention of the dictates of the statute or governing regulations. Our limited task, therefore, is to ensure that the Coast Guard discharged its narrow duty to review the Board's findings. *See Alabama Great Southern Railroad Co., supra,* 340 U.S. at 228, 71 S.Ct. at 272 ("[T]he basic findings essential to the validity of a given [administrative] order will vary with the statutory authority invoked and the context of the situation presented."); *Office of Federal Inspector, supra,* 730 F.2d at 1577–78.

The record, we are persuaded, is fully sufficient to determine whether the Coast Guard properly deferred to the Board's findings. Manhattan Tankers has never contested that the Board members were "among the most knowledgeable and highly respected marine surveyors in the Southeastern United States." J.A. at 288. The undisputed evidence is that the Board conducted a thorough inspection of the vessel and relevant documents both before and after repairs were accomplished; this factor amply justifies the Coast Guard's reliance on the Board's findings as to initial damage and necessary repair costs. 596 F.Supp. at 985–986; J.A. at 288, 292. With respect to the ARKAS' appraised salved value, the Board explicitly noted that its determination included consideration of coastwise trading privileges, as required by the regulations. J.A. at 166.

Moreover, the Coast Guard relied on other record evidence to confirm the reasonableness of the Board estimate of salved value.[6] J.A. at 290–291 (Affidavit of Mr.

**6.** This court may properly uphold the Coast

Guard's decision on the basis of affidavits or

Yglesias). In particular, the Coast Guard considered "that the price paid for the vessel in an arms-length transaction between non-affiliated corporations after public marketing by independent brokers was $7.75 million" and that the relatively small variation of that figure from the Board's own estimate could be attributed to factors other than Board error. *Id.* We conclude that the Coast Guard's explanation is sufficient, particularly since even a fifty percent error in the Board's salved value figure would not have rendered the ARKAS ineligible for documentation.[7]

 Finally, we need not tarry long over Manhattan Tankers' arguments that the Coast Guard based its decision on irrelevant factors or failed to consider relevant factors. Manhattan contends that the Board should have been instructed to consider the cost of constructing a new tanker comparable to the repair ARKAS. But neither the statute nor the regulations require consideration of that factor, especially when the market is such that no new vessels are in fact being constructed. In a similar vein, Manhattan asserts that the Coast Guard erred by informing the Board

that as part of the salved value determination it could consider the market price paid for the ARKAS in its wrecked condition. Nothing in the regulations or statute, however, precludes consideration of purchase price. 596 F.Supp. at 987.[8] In addition, Manhattan argues that the Coast Guard abused its discretion by failing to consider the competitive impact of the ARKAS' enrollment on the existing coastwise trade participants. Regardless of whether the Coast Guard *could* consider that factor,[9] the Wrecked Vessels Statute does not expressly call for any competitive-impact analysis beyond the three-fourths U.S. rebuilt requirement; the statute clearly does not compel such an analysis. Since the existing regulations likewise fail to require consideration of competitive impact, the Coast Guard was under no obligation to do so before accepting the Board's findings as authorized by statute.

*Affirmed.*

testimony by the administrator who made the decision concerning his reasoning at the time of the decision. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971) (permitting testimony to be adduced on remand where the basis for the administrator's decision upon initial review is unclear or inadequately explicated). We, of course, have the benefit of the views of the decisionmaker, Mr. Yglesias, as to the basis for his accepting the Board of Appraisers' analysis. Nothing whatever would be gained by remanding the case to the agency for an explanation that is already before us and that is consistent with the administrative record. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 285 (D.C.Cir. 1981).

7. With $35.7 million in reasonable and necessary U.S. repairs, the ARKAS would have been three-fourths U.S. rebuilt even with an $11 million "appraised salved value."

8. In its consideration of the application of another vessel, the PROTECTOR ALPHA, the Coast Guard concluded that "the actual sale price of a vessel should not control the application of the Wrecked Vessel Act." J.A. at 304. Although the

Coast Guard may not disregard its own precedents, we are satisfied that the reasoning in PROTECTOR ALPHA is not controlling here. There, the Coast Guard found that where a "proper market" is lacking, such as where the sale price is set by scrap dealers, "the appraisers are to go through an analysis utilizing replacement cost, less depreciation, to arrive at the salved value." J.A. at 304. Manhattan Tankers concedes, however, that the market conditions in this case do not bear any resemblance to those *described* by the Coast Guard in explaining its decision in PROTECTOR ALPHA. Brief for Manhattan Tankers at 53; *see* 596 F.Supp. at 987. Although Manhattan takes issue with the Coast Guard's description of the market in PROTECTOR ALPHA, this case is scarcely the proper forum for any such attack; in any event, this contention has no bearing on the applicability of the reasoning in PROTECTOR ALPHA to this case.

9. We find it unnecessary to decide whether the District Court properly interpreted the Wrecked Vessels Statute to bar the Coast Guard from exercising discretion to deny documentation applications. *See supra* note 5.