KEYSTONE SHIPPING COMPANY and Marine Transport Lines, Inc., Plaintiffs,

v.

UNITED STATES of America, James H. Burnley, IV, Secretary of the United States Department of Transportation and Paul A. Yost, Jr., Commandant of the United States Coast Guard, Defendants,

Seabulk America Partnership, Ltd., and Seabulk Transmarine Partnership, Ltd., Defendants–Intervenors.

Civ. A. No. 88–2393 SSH.

United States District Court, District of Columbia.

Jan. 17, 1990.

Robert J. Blackwell, Anne E. Mickey and Paul A. Izzo, Washington, D.C., for plaintiffs.

George P. Williams, Asst. U.S. Atty., Washington, D.C., for defendants.

Michael Joseph, Washington, D.C., for defendants/intervenors.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on the federal defendants' motion to dismiss, plaintiffs Keystone Shipping Company's and Marine Transport Line, Inc.'s (hereinafter referred to jointly as Keystone Shipping) opposition, defendant-intervenors Seabulk America Partnership Ltd.'s and Seabulk Transmarine Partnership, Ltd.'s (hereinafter referred to jointly as Seabulk) opposition, and defendants' reply. On consideration of the entire record, defendants' motion is granted.

■ This case involves a foreign owned and built tanker known as the M/V FUJI (FUJI) which exploded off the coast of Cape Hatteras. As it was being towed to port, the tanker broke apart and all but the stern portion sank. The remaining portion of the wrecked tanker was purchased thereafter by Seabulk, an American company. Seabulk requested a Coast Guard determination that the FUJI qualified for documentation under the Wrecked Vessel Act (WVA). 46 U.S.C. § 14. A determination that the FUJI was qualified under the WVA would allow the FUJI to participate in coastwise trading. Coastwise trade, which involves the transportation of merchandise or passengers between points in

the United States, is limited to American owned and built vessels, vessels approved for coastwise trade by special legislation, or vessels which qualify under the WVA. *See* The Vessel Documentation Act, 46 U.S.C. §§ 12101, 12106. To qualify under the WVA, the Coast Guard must determine that: (1) the vessel is owned by a citizen of the United States; (2) the vessel was wrecked off the coast of the United States or in adjacent waters; (3) the vessel was repaired in a United States port; and (4) that the repairs are equal to three times the appraised salved value of the vessel.[1] *See Manhattan Tankers, Inc. v. Dole,* 787 F.2d 667, 668 (D.C.Cir.1986) (hereinafter *Manhattan III* ) (affirming 596 F.Supp. 974 (D.D.C.1984) (J. Richie) (hereinafter *Manhattan II* )).[2]

Seabulk, in its request for wrecked vessel status, told the Coast Guard that it planned to reconstruct the vessel. Seabulk estimated that it would spend millions repairing the vessel. The Chief Counsel of the Coast Guard notified Seabulk in a letter dated June 17, 1985, that "the Coast Guard concluded that the vessel was wrecked in waters covered by [the Act]." (Seabulk Ex. 3.)

As a result, the Coast Guard appointed a board of appraisers to determine the salved value of the FUJI. Initially the board of appraisers set the appraised value of the FUJI at $6,703,000. Seabulk protested the findings of the board. The board reconsidered the original appraisal and readjusted the salved value, arriving at a new salved value of $3,834,000.

---

1. 46 U.S.C. § 14 also provides that the expense of the appraisal shall be borne by the owner of the vessel. In addition, if any material matters of fact sworn to or represented by the owner in order to obtain the registration of the vessel are not true, there shall be a forfeiture of the vessel to the United States.

2. The *Manhattan* series of cases began when a competitor questioned similar preliminary decisions of the Coast Guard. The plaintiff in *Manhattan I* claimed that the Coast Guard's determination that the vessel in contention was a wrecked vessel and its determination of the vessel's salved value were arbitrary and capricious and contrary to law. *Manhattan Tankers, Inc. v. Lewis,* Civ. Action No. 82–3471 (D.D.C.1983) (Judge June Green). Judge June Green held

that plaintiff lacked standing and dismissed the action as not ripe for judicial review. After Judge June Green's ruling, the vessel was rebuilt and the Coast Guard determined that the vessel in contention was a wrecked vessel under the statute and eligible for coastwise trade. Plaintiff again brought action in this Court. Judge Richie determined that Manhattan Tankers had standing to challenge the final agency action, *Manhattan Tankers, Inv. v. Dole,* 587 F.Supp. 473 (D.D.C.1984), and ruled that the Coast Guard's determinations were not arbitrary and capricious. *Manhattan Tankers, Inc. v. Dole,* 596 F.Supp. 974 (D.D.C.1984) (*Manhattan II* ). *Manhattan II* was affirmed by *Manhattan III,* 787 F.2d 667 (D.C.Cir.1986).

Seabulk then notified the Coast Guard that it planned on connecting the surviving stern section of the FUJI to the bow section of another wrecked vessel. The latter vessel, a CATUG built with federal subsidies, was restricted from operating in domestic trade. In 1981, the CATUG, known as the OXY PRODUCER, was wrecked in a storm. The tug portion of the OXY PRODUCER sank, but the barge was left intact (BARGE 4102).[3] Seabulk's novel plan was to join that barge with the stern of the FUJI and to obtain permission under the WVA to use the vessel in coastwise trade. Such an endeavor would reduce the cost of rebuilding the FUJI and would allow Seabulk to utilize the good portions of both wrecked vessels.[4]

Seabulk wrote to the Coast Guard with respect to its proposed reconstruction and asked that the Coast Guard consider the completed vessel to be the rebuilt FUJI rather than the rebuilt barge so it could compete in coastwise trade. The Coast Guard responded, stating that Seabulk's understanding—that the rebuilt vessel would be considered the FUJI rebuilt—was confirmed. (Seabulk Ex. 10.) Accordingly, as noted in fn. 4, Seabulk filed an application with Marad requesting the termination or amendment of the contract which prohibited BARGE 4102 from involvement in coastwise trade. Marad determined that the restrictions on BARGE 4102 would not apply to the barge once it was joined with the FUJI. (Plaintiffs' Ex. G.) Marad based its decision on the Coast Guard's confirmation of Seabulk's understanding that the venture would result in a rebuilt FUJI.[5] (Plaintiffs' Ex. H.)

Plaintiffs Keystone Shipping and Marine Transport Lines are involved in coastwise trade. They claim that the rebuilt FUJI ("Seabulk America") will compete directly with plaintiffs' vessels in the business of transporting chemicals and other specialty products in coastwise trade. Keystone Shipping claims that it has suffered severe injuries in the form of depressed prices and difficulties in obtaining long-term chartering business as a result of the Coast Guard's decisions. Keystone Shipping further alleges that it will continue to be damaged if the rebuilt FUJI is allowed to participate in coastwise trade.

Accordingly, plaintiffs filed their complaint in this case claiming that three rulings of the Coast Guard are "arbitrary and capricious, an abuse of discretion, contrary to law, without observance of procedure, and without adequate explanation." (Plaintiffs' Complaint at 20.) The three rulings plaintiffs contest are: (1) that the rebuilt vessel will be considered the FUJI and not BARGE 4102; (2) that the joining of BARGE 4102 with the FUJI is a "repair" under the Wrecked Vessel Act; and (3) that the salved value of the FUJI is $3,834,000.

The federal defendants have filed a motion to dismiss, claiming that (1) the Court lacks jurisdiction because there is no final agency action, (2) plaintiffs lack standing, and (3) the decisions complained of are not yet ripe for judicial review. Defendants argue that until a final determination is made that the completed vessel's repairs are equal or greater than three times its salved value, the plaintiffs may not challenge the agency's preliminary determinations. Defendants rely primarily on a Memorandum opinion issued in *Manhattan Tankers, Inc. v. Lewis*, Civ. Action No. 82–3471 (D.D.C. June 23, 1983) (Judge June Green). (*Manhattan I*.) Both plaintiffs and defendant-intervenors oppose defendants' motion.

After careful review of the entire record, the Court concludes that the issue is not

**3.** When Seabulk purchased BARGE 4102 the proviso excluding the CATUG from domestic coastwise trade ran with the vessel. Accordingly, Seabulk covenanted that BARGE 4102 was not entitled to coastwise trading privileges.

**4.** In order to use the thus newly-created "Seabulk America," Seabulk obtained a determination from the Maritime Administration ("Marad") that the exclusion proviso which ran with the barge would not be applied to the "Seabulk America." As a result of Marad's decision, plaintiffs filed a companion lawsuit, Civil Action No. 88–3202 SSH.

**5.** As noted in fn. 4, the new vessel resulting from the joining of the FUJI and the barge would be considered the rebuilt FUJI, and would be renamed "Seabulk America."

ripe and plaintiffs do not have standing at this time to challenge the Coast Guard's determinations.

■ The ripeness doctrine prevents courts from "entangling themselves in abstract disagreements over administrative policies" through avoiding premature adjudications. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In addition, it protects agencies from "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id. See also State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474, 478 (D.C. Cir.1986) *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). The determination of whether or not something is ripe, as this Court pointed out in *Genentech, Inc. v. Bowen*, 676 F.Supp. 301, 309 (D.D.C.1987), is very much a matter of practical common sense. The Supreme Court in *Abbott Laboratories* set forth a two-step level of inquiry to help in the determination of ripeness. First, "the fitness of the issues for judicial decision" must be determined. Second, a court must examine the "hardship" incurred by the parties should the court withhold consideration. 87 S.Ct. at 1515.

■ The "fitness" inquiry involves several factors: (1) Is the agency position merely tentative, or is it sufficiently final to demand compliance with its announced position? *Ciba–Geigy Corp. v. United States Environmental Protection Agency*, 801 F.2d 430, 436 (D.C.Cir.1986). (2) Is the issue in dispute a matter of law or will the Court be called on to resolve factual disputes properly left to the agency? *Genentech*, 676 F.Supp. at 309. (3) Will the Court's deliberations benefit from letting the question arise "in some more concrete and final form?" *Eagle Picher Industries v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985).

In considering the fitness prong of the test, the Court finds that the agency positions are not merely tentative. However, because Seabulk has not applied for final documentation, the preliminary decisions made by the Coast Guard and the Board of Appraisers are not sufficiently final to demand compliance, nor are they ripe for review.[6] In addition, at this point the factual and legal disputes are too closely linked to separate out for appropriate review. As in *Manhattan I*, Civ. Action No. 82–3471 at 10, the Court is faced with factual as well as legal questions. *See also Manhattan II*, 596 F.Supp. at 982. Thus, the Court would be in a better position to review the Coast Guard's decisions after final administrative action is taken.

In considering the hardship prong, the Court must look at the countervailing interests of the parties. *State Farm Mutual Automobile Ins. Co.*, 802 F.2d at 479. "It is well settled that for an institutional interest in deferral to be outweighed, postponing review must impose a hardship on the complaining party that is immediate, direct, and significant." *Id.* at 480. The Court finds that the hardship incurred by Keystone, should review of the Coast Guard's decisions be delayed until final documentation and approval occurs, if in fact they do, is minimal. Keystone Shipping argues that they are losing shipping contracts based on the anticipated approval of the new Seabulk America. The Court finds this harm tenuous at best. Defendant-intervenors' Seabulk have a better argument. They argue that they are investing millions of dollars based on the Coast Guard's preliminary decisions. However, regardless of the results of this case, the Seabulk intervenors still run the risk that the improvements will not be appraised as repairs equal to or greater than three times the salved value. Thus, while immediate review might mitigate the risk, it would not remove it.

---

6. The Court likens this to the baking of a cake. The measurements for most of the ingredients have been made and are being mixed, but until the decision is made to actually bake the cake, the Court cannot tell whether the correct measurements have been made. To stop and con-test each ingredient might in the long run prevent a mishap in the final product, but, should the cake never be baked (or the ship not built, or the repairs put on the vessel not equal three times the salved value), the cumbersome and costly review would be for naught.

On the other hand, allowing plaintiffs to challenge Coast Guard decisions at each step would place undue burdens on the Coast Guard—to say nothing of the courts—and would be contrary to the purposes of the statute.[7] Compared to the unending litigation that the Coast Guard would face should the Court allow its preliminary decisions to be questioned judicially, neither parties' hardship justifies immediate review.[8] Accordingly, since the Court is not satisfied that the issues at hand now are proper for judicial review or that the plaintiffs will suffer hardship should the Court withhold consideration, the Court finds that plaintiffs' complaint is not ripe and dismisses this action.

 In addition to not being ripe, the Court concludes that plaintiffs lack standing to challenge the Coast Guard's preliminary decisions. To establish standing, "a litigant must plead an injury in fact fairly traceable to the conduct complained of and likely to be redressed by the relief requested." *American Postal Workers Union, AFL–CIO v. United States Postal Service,* 891 F.2d 304, 308 (D.C.Cir.1989) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Except for broad allegations that their shipping charges are being affected because of rumors of the Seabulk America, plaintiffs provide no injury in fact which is likely to be redressed by the relief requested. In fact, most of the alleged injury is based upon the likelihood of the rebuilt vessel's competing against them in coastwise trade. As the Court has pointed out, until final repairs have been completed, and applications for documentation approved, no one knows if the rebuilt vessel actually will compete against them.[9] Accordingly, the plaintiffs' alleged injuries are too speculative to confer standing at this time.[10]

Accordingly, the defendants' motion to dismiss is granted.

SO ORDERED.

7. As the Court pointed out in *Manhattan III,* 787 F.2d at 670, "the statutory and regulatory scheme ... was especially crafted to minimize the costs and burdens of administration."

8. The Court needs only to look at the *Manhattan Tankers* saga for proof that these preliminary decisions will be continually questioned. As demonstrated, courts can review the Coast Guard's rulings more efficiently if the Coast Guard is given the opportunity to make a final ruling on the vessel's wrecked vessel status. Such delay does not eliminate a competitor's opportunity timely to appeal the Coast Guard's rulings.

9. Plaintiffs state that as the result of new tankers entering the trade in the 1970's, prices plummeted and a severe market downturn occurred. Plaintiffs further state that not one of the six chemical/parcel tankers newly-built in the 1980's is capable of covering its costs. Given this view of the depressed market, the Court wonders how a sophisticated company like Seabulk would want to spend the millions of dollars necessary to join the two surviving portions of the two wrecked vessels. In fact, given plaintiffs' view of the market, the Court must consider the fact that market constraints may weigh against the completion of the rebuilt vessel, pointing out another reason why the Court should not intercede at this time.

10. The Court notes that once the Coast Guard's final decision is made and the vessel is enrolled, if in fact that happens, plaintiffs' alleged competitive harm would satisfy the standing requirement. *See Manhattan III,* 787 F.2d at 670, n. 3.